DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice* pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| OUR COMMON WEALTH 670, PÅGANWATCH, CONSERVATION COUNCIL FOR HAWAIʻI, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States,<br><br>Defendants. | CIVIL NO. CV-26-469<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Our Common Wealth 670, PåganWatch, Conservation Council for Hawai‘i, and Center for Biological Diversity (collectively, Plaintiffs) hereby complain of the actions of Defendants National Marine Fisheries Service (NMFS) and Secretary of Commerce Howard Lutnick as follows:

## INTRODUCTION

1. The United States has never opened its waters to deep-sea mining. But the Marine Minerals Administration (MMA) has recently announced plans to sell leases allowing mining of the seabed off Pacific Island territories, first American Samoa and now the Mariana Islands. Before it can do so, MMA must complete consultation with NMFS under section 7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), to ensure that deep-sea mining activities will not push any endangered or threatened species closer to extinction or destroy the critical habitat that those species need to survive and eventually recover. This consultation process is a central feature of the ESA's framework for protecting endangered and threatened species.

2. On August 10 of this year, NMFS issued a final determination (Letter of Concurrence) that deep-sea-mining leases off the Commonwealth of the Northern Mariana Islands (CNMI) and Guam are not likely to adversely affect any threatened or endangered species or critical habitat, giving MMA the green light

under the ESA to hold the sale. Our Common Wealth 670, PåganWatch, Conservation Council for Hawai‘i, and Center for Biological Diversity challenge NMFS's arbitrary and unlawful determination.

3. The CHamoru (Chamorro) and Refaluwasch (Carolinian) peoples in the Marianas have a sacred relationship to the ocean, with an abundant and healthy ocean being essential to their livelihoods and continued health. For these communities, the ocean is their origin and a family member to be treated with respect. Marine species are also particularly important for navigation. Traditional Refaluwasch wayfinding involves using living "seamarks" like individual sea turtles or whales, which are associated with locations around known islands as a last recourse for lost navigators to regain their bearings. Each seamark has its own individual name and distinctive characteristics.

4. Deep-sea mining entails using heavy machinery to scour the seabed for potato-sized mineral aggregations called polymetallic nodules or, in some cases, to strip mine mineral-laden crusts from the sea floor. The machinery can destroy nearly all life in its path. Mining stirs up sediments that can introduce toxic substances into the food web and can smother seafloor ecosystems like coral reefs 100 kilometers (over 60 miles) away. Even just exploring for seabed minerals introduces extremely loud noise into the marine environment that can harm marine mammals and other wildlife. While much is known about the threats

of environmental destruction that these largely untested activities pose, the full extent of potential harm is still coming into view.

5. MMA proposes to open nearly 70 million acres of the seabed around CNMI and Guam to mineral exploration and mining. In July 2026, MMA (then known as the Bureau of Ocean Energy Management or BOEM[1]) asked NMFS to concur that its lease sale off the Mariana Islands is "not likely to adversely affect" any species or critical habitat. Shortly thereafter, in a short letter with no analysis and without even evaluating the effects from exploration or mining activities, NMFS concurred.

6. NMFS's Letter of Concurrence violates key legal requirements under the ESA and reflects a wholly arbitrary and capricious determination. First and foremost, NMFS did not analyze all effects of MMA's action on ESA-listed species or critical habitat, ignoring the effects from the exploration, testing, development, and mining that will result from the lease sale. Even for the more limited "preliminary activities" on a lease that NMFS did consider, the Letter of

[1] The Secretary of the Interior recently merged BOEM and the Bureau of Safety and Environmental Enforcement into a single agency, the Marine Minerals Administration. *See* Secretarial Order 3451, "Establishment of the Marine Minerals Administration" (July 10, 2026), https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-minerals-administration_final_508.pdf. Both the applicable regulations and the Letter of Concurrence challenged here refer to BOEM. This Complaint will use the current name of the agency (MMA) rather than BOEM.

Concurrence contains no meaningful assessment of the many ways those activities harm ESA-listed whales, sea turtles, and other wildlife.

7. Plaintiffs therefore ask this Court to declare that NMFS's Letter of Concurrence is arbitrary and capricious and contrary to law, in violation of the Administrative Procedure Act (APA) and ESA, and to vacate the Letter of Concurrence.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1361 (actions to compel officers and agencies of the United States to perform their duty); 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy); and 5 U.S.C. §§ 701–706 (actions under the APA).

9. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and also because Plaintiff Conservation Council for Hawaiʻi resides in this judicial district.

10. This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

11. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

PARTIES

12. Plaintiff OUR COMMON WEALTH 670 (Common Wealth) is an Indigenous-led non-profit organization based in CNMI. Common Wealth has members in Saipan, all of whom are dedicated to the protection and preservation of the Northern Mariana Islands.

13. Common Wealth's mission is to protect CNMI's ancestral lands, seas, and skies from irreparable damage caused by activities that threaten the health, physical environment, and livelihoods of the people of CNMI. As part of pursuing that mission, Common Wealth frequently engages in advocacy for the protection of ESA-listed species such as the green, hawksbill, loggerhead, olive ridley, and leatherback sea turtles, the scalloped hammerhead shark, and the giant manta ray.

14. Common Wealth's members include ocean elders, teachers, youth, cultural practitioners, community advocates, environmentalists, and recreational paddlers. Common Wealth members' use and enjoyment of Saipan's marine

environment will be harmed by deep-sea mining and mineral exploration activities on the planned leases.

15. For example, one of Common Wealth's members was born and raised in Saipan and currently teaches courses on natural resources management and conservation at the Northern Marianas College. These courses each involve a weekly lab component where the member takes students out to beaches to observe marine species, including ESA-listed species, and, where possible, take part in their conservation. This includes looking for green sea turtle nesting sites on Saipan's Tank Beach and participating in coral surveys to learn how to identify and monitor coral species, including *Acropora globiceps*. Additionally, this member has consistently paddled with groups like the Marianas Pacific Paddlers to maintain the member's cultural connection to the sea and enjoys routinely spotting ESA-listed sea turtles and giant manta rays while out paddling in Saipan's lagoon.

16. Deep-sea mining and mineral exploration activities off the Mariana Islands threaten to harm the ESA-listed species that this member observes during her recreational and teaching activities and that she hopes to protect by teaching the next generation about the need for their conservation, thereby injuring her professional, educational, cultural, recreational, and aesthetic interests.

17. Plaintiff PÅGANWATCH is a grassroots non-profit group based in Saipan that is dedicated to advocating for the rights of residents of Gani', the string

of Mariana Islands north of Saipan. PåganWatch's membership includes individuals of CHamoru and Refaluwasch descent who frequently visit Pågan or are current or past residents of Pågan, the largest island of Gani'. PåganWatch's mission is to protect Gani' and its people by advocating for and protecting the rights and interests of the people of the Marianas, including the right of Gani's people to practice their indigenous culture.

18. PåganWatch's members engage in efforts to live as their ancestors did—farming, fishing, and engaging in cultural practices, trying to pass on traditions and native ways of life to their children for the preservation of their culture and heritage. PåganWatch's members' interests in ESA-listed marine wildlife will be harmed by allowing deep-sea mining-related activities in and around the proposed lease areas in the Mariana Islands.

19. For example, one of PåganWatch's members is a master traditional navigator and Refaluwasch community leader. This member goes on ocean voyages almost daily, traveling throughout the waters and islands of Gani', visiting Pågan monthly, and traveling in and around the Proposed Lease Area up to four times a year. For this member, voyaging is a cultural practice. Part of that practice includes observing and connecting with the surrounding marine environment and species to inform how he conducts his voyage, including the ESA-listed sea turtle, giant manta ray, shark, and whale species that occur in the Marianas. Furthermore,

this member looks forward to his voyages and feels a sense of fulfillment from being able to see these ESA-listed species.

20. Deep-sea mining and mineral exploration activities off the Mariana Islands threaten to harm the ESA-listed species that this member observes during his cultural voyages, thereby injuring his cultural, recreational, and aesthetic interests.

21. Plaintiff CONSERVATION COUNCIL FOR HAWAIʻI (CCH) is a non-profit citizens' organization incorporated and based in Hawaiʻi with approximately 4,000 members in Hawaiʻi, the United States mainland, and foreign countries. CCH is the Hawaiʻi affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.

22. CCH's mission is to protect Hawaiʻi's native wildlife, including threatened and endangered species, and to restore the ecosystems on which those species depend for future generations. The wildlife species that CCH has worked to protect include ESA-listed species of whales, sea turtles, sharks, rays, and seals that are found in the waters around the Mariana Islands and Hawaiʻi. CCH's members' interests in these species will be harmed by allowing deep-sea mining-

related activities in and around the proposed lease areas in the Mariana Islands, as well as by associated increased vessel traffic in Hawaiʻi's waters.

23. CCH members include cultural practitioners and marine biologists who visit, study, work, and recreate in marine waters near the planned lease areas and in Hawaiʻi that would be affected by deep-sea mining-related activities. CCH members study, enjoy, and benefit from the threatened and endangered species in waters that occur in the waters around Mariana Islands and Hawaiʻi—including, but not limited to, ESA-listed whales, sea turtles, sharks, and rays that migrate between the two areas—for cultural, spiritual, professional, scientific, recreational, and aesthetic purposes. CCH members' use and enjoyment of the marine environment around the Mariana Islands and around Hawaiʻi will be harmed by deep-sea mining and mineral exploration activities on the planned leases.

24. For example, one of CCH's members is a Native Hawaiian professional diver and cultural practitioner who has observed and studied—and will continue to observe and study—ESA-listed species in the ocean surrounding the Hawaiian Islands. This member has a cultural and spiritual connection to the ESA-listed species that occur in Hawaiʻi's waters that will be affected by deep-sea mining exploration and exploitation activities in the Mariana Islands. This member regularly takes friends and family on nearshore diving tours to *kilo* (Native Hawaiian observational technique) for Central North Pacific green sea

turtles, hawksbill turtles, giant Pacific manta rays, Hawaiian monk seals, and oceanic whitetip sharks. This member also regularly ventures on boats to deeper waters around the Hawaiian Islands to *kilo* for species including false killer whales, sperm whales, olive ridley sea turtles, and leatherback sea turtles. This member has a deep cultural and familial connection to Hawai‘i’s sharks, including the oceanic whitetip shark, which he regards as *‘aumakua* (embodiment of ancestral guardians), and which his family and ancestors, with lineage as *kahu manō* (shark keepers), have advocated to protect since time immemorial. Deep-sea mining and mineral exploration activities off the Marianas, as well as related vessel traffic in Hawai‘i’s waters, threaten to harm the ESA-listed species that this member observes (many of which are highly migratory), thereby injuring his cultural, spiritual, and aesthetic interests.

25. Another one of CCH’s members has conducted extensive scientific research regarding the marine environment around the Mariana Islands for more than two decades. This member has been to CNMI on three research trips to study coral reef ecosystems and is currently working on a study of coral reef health using data collected on corals, which will involve additional research trips to CNMI during the next two years. In addition to relying on healthy corals for his scientific studies, this member derives pleasure from observing and photographing healthy corals. Deep-sea mining and mineral exploration activities in the Marianas

threaten to harm the ESA-listed corals and their ecosystems that this member studies and observes, thereby injuring his professional, scientific, recreational, and aesthetic interests.

26. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit environmental organization founded in 1989 and dedicated to the protection of native, threatened and endangered species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Honolulu, Hawaiʻi. The Center has over 100,000 members, including members in Hawaiʻi and the Marianas dedicated to the protection and restoration of imperiled species and wild places.

27. The Center and its members are concerned with the conservation of marine ecosystems and imperiled species, including ones that will be adversely affected by deep-sea mining activities in the Mariana Islands. The Center has been involved in many lawsuits and campaigns against deep-sea mining, and other suits to protect the wildlife that will be harmed by deep-sea mining and exploration activities in the proposed lease area, as well as from associated vessel traffic, including ESA-listed sharks, rays, whales, seals, seabirds, sea turtles, and corals.

28. Members of the Center derive aesthetic, professional, cultural, educational, and recreational benefits from viewing listed species that live in or

migrate through the proposed lease area and other areas affected by the action, and that will be harmed by deep-sea mining and exploration activities.

29. For example, one Center member is a science professor in Guam who regularly swims and dives offshore of Guam to view sea turtles, coral reefs, and marine mammals. She especially loves haggan, which is the CHamoru name for green sea turtles. When she is teaching marine biology, she brings students on boat trips to the outer reef to observe sea turtles and other marine species in their natural environment. She teaches her students about Guam's natural history and environment in order to cultivate the next generation of environmental stewards. In addition to her recreational and professional interests in sea turtles, corals, and other marine species, viewing these animals is also important to her spirituality, as they are a connection to both her ancestors and future generations. Seabed mining and mineral exploration activities off the Marianas threaten to harm the ESA-listed species that this member studies, teaches about, and observes, thereby injuring her professional, scientific, recreational, spiritual, and aesthetic interests.

30. Another Center member lives in Saipan and is a cofounder of an organization dedicated to reviving, promoting, and preserving the maritime cultural traditions of the Mariana Islands. His organization teaches traditional voyaging and wayfinding that relies in part on observations of marine wildlife—including ESA-listed whales and sea turtles—in specific areas to as a means of determining

one's location. He enjoys spending time in and on the water and looking for imperiled marine species such as sea turtles and humpback whales. Seabed mining and mineral exploration activities off the Marianas threaten to harm the ESA-listed species that this member observes and teaches about on his voyages, thereby injuring his cultural, spiritual, recreational, professional, and aesthetic interests.

31. Another member of the Center is a Native Hawaiian who regularly surfs in Hawai‘i's marine waters and deeply values the opportunity to observe and experience native species like the koholā, or whales—including ESA-listed whales—in their natural environment. Her connection to koholā is both personal and cultural. As a Native Hawaiian, she understands koholā as an important part of the living ocean and of her cultural relationship with the kai (ocean). She takes particular joy in seeing migratory koholā return to Hawai‘i each year and seeks opportunities to observe them while spending time in and around the ocean. She also values observing other protected marine wildlife in Hawai‘i, including ‘īlioholoikauaua (Hawaiian monk seals), honu (green sea turtles), and honu ‘ea (hawksbill sea turtles). Seabed mining and mineral exploration activities off the Marianas (including associated vessel traffic through Hawai‘i waters) threaten to

harm the ESA-listed species that this member observes, thereby injuring her cultural, spiritual, recreational, and aesthetic interests.

32. NMFS's failure to comply with the ESA and APA has caused and is causing Plaintiffs' members procedural harms connected to their substantive cultural, spiritual, professional, scientific, educational, recreational, and aesthetic interests in ESA-listed species in waters of the Mariana Islands and Hawaiʻi. Plaintiffs' members rely on NMFS to comply with the ESA's requirements to guide federal authorizations of activities so as to protect endangered and threatened species from harmful effects of those activities. MMA will issue mineral leases that result in such harmful effects in reliance on NMFS's Letter of Concurrence.

33. The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by NMFS's violation of federal law, as described herein. These harms can only be remedied if the Court orders NMFS to comply with the ESA and APA and conduct a legally adequate consultation for MMA's planned lease sale. Plaintiffs have no other adequate remedy at law.

34. Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration with responsibility for administering and implementing the ESA with respect to marine species, including sea turtles while they are in the water. *See* 50 C.F.R. § 402.01(b); *id.* §§ 223.102, 224.101. Among

other responsibilities, NMFS is responsible for complying with ESA section 7, 16 U.S.C. § 1536, in connection with the issuance of Letters of Concurrence and biological opinions.

35. Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce. In that capacity, Secretary Lutnick is responsible for ensuring that the Department of Commerce and its constituent agencies (including NMFS) comply with applicable law, including the ESA.

## LEGAL FRAMEWORK

### I. ENDANGERED SPECIES ACT

36. Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

37. The ESA's "language, history, and structure . . . indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

38. In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. 16 U.S.C. § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further provides for the designation of critical habitat to protect areas essential to the survival and eventual recovery of threatened and endangered species. *Id.* § 1533(a)(3)(A)(i); *see id.* § 1532(5).

39. Section 7(a)(2) of the ESA then requires each federal agency, including MMA, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

40. The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. Each

agency, including MMA, must "review its actions at the earliest possible time to determine whether any action *may affect*" any endangered or threatened species or critical habitat. *Id.* § 402.14(a) (emphasis added). If so, the agency planning to undertake the action (the action agency) must consult the appropriate wildlife service—the U.S. Fish and Wildlife Service or, as here, NMFS—to ensure compliance with ESA section 7(a)(2)'s mandate. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.14.

41. In fulfilling the requirements of ESA section 7, both the action agency and the consulting wildlife agency must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

42. Moreover, when engaging in ESA section 7 consultation, the consulting wildlife agency must analyze the effects of the entire agency action, which include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018).[2] "Indirect effects are those that are caused by the proposed action and are later in time, but still are

---

[2] On March 30, 2026, the U.S. District Court for the Northern District of California held that the definition of "effects of the action" promulgated in 2019 was facially invalid and reinstated the definition that was in effect prior to 2019. *Center for Biological Diversity v. U.S. Dep't of Interior*, Case No. 24-cv-04651-JST, 2026 WL 898264, at *15, *25 (N.D. Cal. Mar. 30, 2026).

reasonably certain to occur." 50 C.F.R. § 402.02. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification." *Id.* "Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

43. To facilitate compliance with ESA section 7(a)(2), the action agency must prepare a biological assessment to "evaluate the potential effects of [its] action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a); *see also* 16 U.S.C. § 1536(c)(1).

44. As a general rule, the action agency must then engage in formal consultation with the consulting wildlife agency, unless the action agency determines and the consulting wildlife agency concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a), (b)(1).

45. If the consulting wildlife agency concurs and makes a final determination that the action is not likely to adversely affect any listed species or critical habitat, "the consultation process is terminated, and no further action [under ESA section 7(a)(2)] is necessary." *Id.* § 402.13(c). The concurrence letter must, at a minimum, document the consulting wildlife agency's "analysis, based on review of all potential effects, direct and indirect." U.S. Fish & Wildlife Serv.

& Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*].

46. If the consulting wildlife agency does not concur that the action is not likely to adversely affect any listed species or critical habitat, then formal consultation is required. 50 C.F.R. § 402.14(a). Formal consultation involves a more comprehensive evaluation of the effects of the action that culminates in the consulting wildlife agency's biological opinion on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h).

47. If the consulting wildlife agency concludes in the biological opinion that the proposed action is likely to jeopardize a species, the agency must specify reasonable and prudent alternatives, if any, that would avoid the likelihood of jeopardy, or specify that no such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). If the consulting wildlife agency concludes that the action is not likely to jeopardize the continued existence of the species, but that incidental take of a listed species will occur, the agency must produce a written "statement concerning incidental take" that "[s]pecifies the impact of incidental taking as the amount or extent of such taking" on the species. 50 C.F.R. § 402.14(i)(1)(i); *see* 16 U.S.C. § 1536(b)(4). An incidental take statement must also specify "reasonable and prudent measures" that are "necessary or appropriate to minimize

[the] impact of incidental taking on the species" and the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency" to implement the measures. 50 C.F.R. § 402.14(i)(1)(ii), (iv); *see* 16 U.S.C. § 1536(b)(4).

48. The ESA regulations provide for consultation to occur in stages "[w]hen the action is authorized by a statute that allows the [action] agency to take incremental steps toward the completion of the action." 50 C.F.R. § 402.14(k). When such a statute is involved, the consulting wildlife agency "shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered." *Id.* In its biological opinion, the consulting wildlife agency must "includ[e] its views on the entire action," *id.*—not just the first incremental step—and determine, among other things, whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." *Id.* § 402.14(k)(5).

49. Consultation for the first phase of an incremental step action must always be conducted formally, concluding with the consulting wildlife agency issuing a biological opinion. *See id.* § 402.14(k).

50. Compliance with the ESA's section 7 consultation requirement is essential to prevent later substantive violations of the ESA.

## II. OUTER CONTINENTAL SHELF LANDS ACT

51. OCSLA governs the leasing, exploration, and development of minerals on the "Outer Continental Shelf." 43 U.S.C. § 1331 *et seq*. OCLSA defines the Outer Continental Shelf as the seabed extending from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

52. OCSLA authorizes Interior to sell "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k); *see* 30 C.F.R. § 581.0–.47.

53. Upon receiving a lease, the holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." 30 C.F.R. § 582.21(d).

54. Lessees then conduct further exploration, testing, and development activities "in accordance with a plan submitted by the lessee and approved by the Director" of MMA. *Id.* § 582.21(a). "Exploration" includes geophysical surveys, drilling, and sampling of mineral deposits. *Id.* § 582.3. "Testing" includes "removing bulk samples for processing tests and feasibility studies and/or the testing of mining equipment." *Id.* "Development" includes "geophysical activities, drilling, construction of offshore facilities, and operation of all onshore

support facilities" in preparation for production of minerals. *Id.* "Production" is the mining and processing of minerals from the seabed. *See id.* § 582.24.

## III. ADMINISTRATIVE PROCEDURE ACT

55. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

56. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

# STATEMENT OF FACTS

## I. THE WATERS AROUND THE MARIANA ISLANDS ARE HOME TO THREATENED AND ENDANGERED WILDLIFE.

57. The ocean surrounding the Mariana Islands supports rare and diverse marine species, including a rich mosaic of diverse shallow coral reefs and active hydrothermal vents, the Earth's deepest ocean trench, and hundreds of marine species, including a variety of migratory species. Many of the species found in the waters around the Mariana Islands are listed as endangered or threatened under the ESA.

58. The endangered blue whale, fin whale, sei whale, sperm whale, and humpback whale (Western North Pacific Distinct Population Segment (DPS))[3] are found in waters around the Mariana Islands.

59. All five sea turtle populations found around the Mariana Islands are listed as endangered or threatened: the green sea turtle (Central West Pacific DPS), hawksbill sea turtle, loggerhead sea turtle (North Pacific DPS), and leatherback sea turtle are listed as endangered, while the olive ridley sea turtle is listed as threatened.

60. The oceanic whitetip shark, giant manta ray, and scalloped hammerhead shark (Indo-West Pacific DPS) are also found in waters around the Mariana Islands and are listed as threatened.

61. A coral species (*Acropora globiceps*) in the Mariana Islands' waters is listed as threatened. Additionally, NMFS has designated critical habitat in the Mariana Islands for *A. globiceps*.

---

[3] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

## II. DEEP-SEA MINING ACTIVITIES WILL HARM ESA-LISTED SPECIES.

62. Several areas of the deep seabed around the world—including around the Mariana Islands—contain polymetallic nodules, potato-shaped balls of minerals that formed over millions of years as minerals from seawater accrete. Some areas of the seabed—including to the west of the Mariana Islands—contain ferromanganese crusts or polymetallic sulfide deposits, typically around inactive or extinct hydrothermal vents. These three types of deposits hold minerals like nickel, cobalt, and manganese, which can be used to construct electronics, batteries, and other products. Accordingly, companies have expressed interest in mining these deposits from the seabed for profit.

63. To date, there has not been a commercial seabed mining operation established anywhere in the world. Mining the deep sea is technologically and financially difficult. Equipment must operate at depths of thousands to tens of thousands of feet where water pressure is immense.

64. There has been a limited amount of seabed mining exploration and testing activities in international waters and in other countries. Those tests have demonstrated that commercial mining, and even the initial exploration activities, will have devastating effects on the marine environment.

65. Mining activities—whether at the testing phase or production phase—involve scouring the seabed to extract nodules. Mining equipment stirs up toxic

sediment and kills the biota in its path. Mining disturbance studies have found that impacts to the ecosystem persist for at least 44 years, with estimates that ecosystem recovery will take over 100 years. Scientists estimate that sediment plumes from mining can extend for up to 100 kilometers (over 60 miles) from the mining site, smothering corals and other habitats even far distant from the mining site. Such plumes harm not only the corals themselves, but also the sea turtles, sharks, rays, and other species that depend on coral reef ecosystems.

66. Mineral deposits and the sediment collected with them are then transported to a vessel on the surface, which separates the nodules from the sediment. That sediment waste is then discharged higher in the water column. The sediment waste contains toxic metals such as copper, cadmium, zinc, and lead, as well as rare earth elements, that can enter the food chain and bioaccumulate in species like giant manta rays and whales.

67. Exploration for seabed minerals uses a variety of technologies to map and sample the seafloor, including hull-mounted multibeam echosounders, dynamic positioning vessels, autonomous underwater vehicles, remotely operated vehicles, and other autonomous or robotic equipment. The noise from these activities can damage hearing and interfere with essential behaviors in marine mammals and other animals.

68. There are also numerous ways that the vessels used for surveying and mining can harm ESA-listed species, including injury or death from ship strikes, masking of communication and behavioral disturbance from noise, and air and water pollution. Vessel impacts can occur not only where exploration or development activities are taking place, but also while vessels are traveling to or from the project location and when mined minerals are transshipped, potentially to distant ports.

69. For example, the issuance of seabed mining leases offshore of the Mariana Islands can increase vessel traffic to and from Hawaiʻi's ports and through Hawaiʻi's waters from the ships conducting activities on those leases. That vessel traffic can harm ESA-listed species in Hawaiʻi's waters.

## III. MMA PLANS TO HOLD A DEEP-SEA MINING LEASE SALE OFF THE MARIANA ISLANDS.

70. On November 12, 2025, MMA published a "Request for information and interest" (RFI) for a potential offshore mineral lease sale in an area to the east of the Mariana Islands. 90 Fed. Reg. 50872 (Nov. 12, 2025). MMA described the "RFI Area" as "approximately 35,483,044 acres (143,595 $km^2$) with an approximate water depth of 3,700–25,100 feet (1,130–7,650 meters) [that] lies entirely within the [Outer Continental Shelf (OCS)] offshore the Commonwealth of the Northern Mariana Islands." *Id.* at 50874.

71. On March 18, 2026, after receiving over 65,000 comments in response to the RFI—the overwhelming majority of which explained why MMA should not proceed with leasing—MMA announced an "Area ID" that nearly doubled the size of the proposed area for leasing to over 69 million acres by adding a second lease area to the west of the Mariana Islands.

72. On August 18, 2026, MMA published a notice of availability in the Federal Register of the Proposed Leasing Notice for the Commonwealth of the Northern Mariana Islands Outer Continental Shelf Pacific Mineral Lease Sale 2 (PACM–2). 91 Fed. Reg. 53422 (Aug. 18, 2026). MMA proposes to hold the lease sale on December 16, 2026, and will offer for sale five leases encompassing almost all the area described in the Area ID, over 67 million acres total.

73. The Proposed Leasing Notice specifies that "[a]ny lease(s) that are issued will grant the Lessee(s) an opportunity to identify mineral deposits and seek approval to develop these deposit types and minerals, as well as any minerals produced incidental to and in direct association with production from these deposits." The primary lease term will be 20 years, although the term can be extended if a lease enters production. The proposed leases include lease stipulations governing exploration, testing, development, and mining activities.

74. MMA will publish a final leasing notice at least 30 days before the sale date. *See* 30 C.F.R. § 581.17(a).

## IV. NMFS ISSUES AN ARBITRARY AND UNLAWFUL LETTER OF CONCURRENCE THAT MINERAL LEASING WILL NOT ADVERSELY AFFECT ANY ESA-LISTED SPECIES OR CRITICAL HABITAT.

75. On or about July 22, 2026, NMFS received a written request from MMA to initiate expedited informal consultation under the ESA on the proposed lease sale. MMA sought NMFS's concurrence that the proposed action "may affect, but is not likely to adversely affect" any species listed as threatened or endangered or any critical habitat designated under the ESA, avoiding the need to engage in formal consultation under ESA section 7. MMA provided NMFS with a biological assessment in support of the consultation.

76. In its biological assessment, MMA determined that the "action area" (*i.e.*, the "areas to be affected directly or indirectly by the Federal action," 50 C.F.R. § 402.02) for the planned lease sales "encompasses two areas, east and west of the CNMI where most of the Proposed Action will occur," as well as "two additional areas to account for possible vessels transiting from Hawaiʻi and the U.S. West Coast." *See* Biological Assessment, Figure 1.




**Figure 1. Map of the Proposed Action, which includes the CNMI OCS, Hawaiian waters, and the U.S. West Coast**

77. MMA's biological assessment states that the "need" for the lease sale "is to help meet U.S. demand for critical minerals while reducing reliance on imports."

78. Despite MMA's stated reason for the lease sale—to obtain commercially significant quantities of critical minerals—its biological assessment does not include the intended mineral exploration, development, and extraction in the "Effects of the Action." Rather, the biological assessment evaluates only the

effects of "preliminary activities" on the leases and concludes they will be insignificant.

79. The biological assessment indicates that preliminary activities will entail the use of High-Resolution Geophysical (HRG) surveys (including multibeam echosounders, side-scan sonar, and sub-bottom profilers), seabed sampling by remotely operated vehicles, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions.

80. The biological assessment identifies several potential impacts of preliminary activities to ESA-listed marine mammals and sea turtles, including: 1) noise from HRG surveys, geotechnical surveys, aircrafts, and vessels; 2) potential collisions with project-related vessels; 3) potential entanglement in mooring systems associated with the installation of buoys and with the deep-tow survey systems; 4) disturbance to feeding or modified prey abundance; 5) habitat disturbance; and 6) accidental release of pollutants and marine debris. While the biological assessment states the impacts are anticipated to be "insignificant," it indicates that MMA could not estimate the extent of many impacts.

81. For ESA-listed sharks and rays, the biological assessment states that the effects of preliminary activities include habitat disturbance, sediment resuspension (from sampling), fish aggregating device effects of buoys and mooring lines, entanglement, noise from surveys and vessels, artificial light,

electromagnetic field alteration, vessel strikes, and pollution from oil spills and marine debris. The biological assessment concludes that the action is not likely to adversely affect listed fishes.

82. The biological assessment concludes that effects to the ESA-listed coral and other invertebrates include vessel strikes, release of pollutants, and marine debris. The biological assessment concludes that the action is not likely to adversely affect the listed coral and invertebrate species.

83. Finally, the biological assessment asserts that effects to designated critical habitat for several species will be "limited" and "short term and temporary," so concludes that the action is not likely to adversely affected any designated critical habitat.

84. On August 10, 2026, NMFS issued a short letter concurring in MMA's assessment that its "proposed action to issue up to six leases for the purpose of commercial mining … may affect, but is not likely to adversely affect" approximately 60 ESA-listed species, including: endangered blue whales, fin whales, sei whales, and sperm whales, five imperiled sea turtle populations, a threatened coral species, and threatened oceanic whitetip sharks, giant manta rays, and scalloped hammerhead sharks, all of which are found in waters around the Mariana Islands. The list of species that NMFS concluded MMA's planned leasing action "may affect" also includes several imperiled species that are

endemic to Hawaiʻi, including the critically endangered Main Hawaiian Island insular false killer whale and Hawaiian monk seal. NMFS's Letter of Concurrence states that it "concludes informal consultation under section 7 of the ESA" for the action.

85. Like MMA's biological assessment, NMFS's Letter of Concurrence does not contain any analysis of the effects of exploration, testing, development, or production on the leases, even though the Letter of Concurrence acknowledges the action under review is "for the purpose of commercial mining." Those post-leasing activities are likely to harm ESA-listed marine mammals, sea turtles, sharks, manta rays, and coral, as well as critical habitat for coral, in the numerous ways discussed above.

86. Even for preliminary activities, NMFS's Letter of Concurrence does not include any analysis of effects from the placement of moorings and other equipment, or from vessels conducting preliminary activities.

87. For the only stressor NMFS did purport to evaluate—"acoustic operations"—the Letter of Concurrence assumes that all operations "are strictly limited to Tier 4 sound sources as defined by (Ruppel et al. 2022) and *de minimis*." It assumes that "[t]he use of high-impact, medium-penetration, or non-Tier 4 acoustic equipment is prohibited." The Letter of Concurrence does not identify any binding way in which MMA is implementing such limitations or prohibitions.

And there is nothing in MMA's biological assessment, proposed notice of sale, proposed lease stipulations, or proposed information to lessees that would impose such limitations.

88. Overall, NMFS's concurrence is unsupported by any reasoned analysis and is contrary to the best available science. There is no evidence that NMFS had sufficient information to reach a rational and well-supported conclusion concurring that the action is "not likely to adversely affect" any species or critical habitat.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – NMFS's Letter of Concurrence Is Arbitrary and Capricious and Contrary to Law, in Violation of the APA and ESA.

89. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

90. Section 7(a)(2) of the ESA requires each federal agency, in consultation and with the assistance of the relevant wildlife agency, to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Such consultations must use the best available scientific information. *Id.*

91. In an informal consultation, NMFS, as the consulting wildlife agency, must review all relevant information and make a reasonable, factually supported decision as to whether to concur in the action agency's determination that the action is not likely to adversely affect any listed species or critical habitat. 50 C.F.R. §§ 402.12(j)–(k), 402.13; *see ESA Handbook* 3-6 ("All decisions reached during the [informal] consultation process must be based on sound science."). If NMFS "do[es] not agree with the action agency's determination of effects or if there is not enough information to adequately determine the nature of the effects," it may not issue a letter of concurrence. *ESA Handbook* 3-13.

92. NMFS's Letter of Concurrence is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

93. NMFS was required to consider and analyze all effects of the entire agency action in determining whether to concur in MMA's "not likely to adversely affect" determination. 50 C.F.R. §§ 402.12(a), 402.13; *ESA Handbook* 3-6 (stating concurrence must be "based on review of all potential effects, direct and indirect"). When a federal agency sells leases for resource extraction, the entire agency action includes not just leasing, but also exploration, development, and production from the leases. Accordingly, the entire agency action under consultation here includes leasing, exploration, testing, development, and mining activities.

94. Even if post-leasing exploration, testing, development, and mining activities were not part of the agency action, their effects are nonetheless "indirect effects" of leasing because exploration, testing, development, and mining activities "are caused by the proposed action." 50 C.F.R. § 402.02 (2018). Alternatively, post-leasing exploration, testing, development, and mining activities are "interrelated or interdependent with [MMA's leasing] action." *Id.*

95. NMFS did not include the effects of post-leasing exploration, testing, development, or mining activities in reaching its concurrence that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

96. In evaluating the effects of preliminary activities on leases, the Letter of Concurrence does not assess the effects of vessel strikes, vessel noise, vessel discharges, or mooring lines and buoys in reaching its concurrence that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

97. NMFS's evaluation of impacts from HRG surveys during preliminary activities is premised on the assumption that MMA will implement requirements to limit sound from survey equipment. There is, however, no evidence that MMA

has committed to implementing HRG limits through binding measures. The Letter of Concurrence contains no evidence that NMFS considered whether MMA can or will do so. NMFS's reliance on HRG limits to reach its concurrence decision is arbitrary and capricious and contrary to the ESA and its implementing regulations.

98. For the foregoing reasons, NMFS's Letter of Concurrence is arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION – NMFS Failed to Issue a Biological Opinion that Evaluated MMA's Entire Action, in Violation of the APA and ESA.**

99. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

100. To the extent that NMFS claims to have engaged in incremental step consultation pursuant to 50 C.F.R. § 402.14(k), that regulation requires NMFS to "issue a biological opinion on the incremental step being considered, including its views on the entire action." Among other things, the regulation requires NMFS to determine whether "[t]here is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act." *Id.* § 402.14(k)(5).

101. NMFS did not issue a biological opinion for MMA's planned lease sale and did not express any views on whether the entire action, including post-leasing exploration, testing, development, and mining activities, would likely violate ESA section 7(a)(2).

102. For the foregoing reasons, NMFS's failures to issue a biological opinion and to express the required views are arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

103. Enter a declaratory judgment that NMFS's Letter of Concurrence violates the ESA, its implementing regulations, and the APA;

104. Hold unlawful and set aside NMFS's Letter of Concurrence;

105. Issue appropriate injunctive relief;

106. Maintain jurisdiction over this action until NMFS complies with the ESA, APA, and every order of this Court;

107. Award Plaintiffs the costs of this litigation, including reasonable attorney fees; and

108. Provide such other relief as may be just and proper.

DATED: Honolulu, Hawai'i, September 8, 2026.

Respectfully submitted,

/s/ David L. Henkin

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813

T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
*(pro hac vice* pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Our Common Wealth 670, PåganWatch,
Conservation Council for Hawaiʻi, and
Center for Biological Diversity