DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| OUR COMMON WEALTH 670, PÅGANWATCH, CONSERVATION COUNCIL FOR HAWAIʻI, and CENTER FOR BIOLOGICAL DIVERSITY, | CASE NO. CV-26-469 JAO-KJM |
| Plaintiffs, | PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF COMPLIANCE |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States, | Judge: Hon. Jill A. Otake |
| Defendants. | Trial Date: None Set |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATUTORY FRAMEWORK ..... 3

A. Endangered Species Act ..... 3

B. Outer Continental Shelf Lands Act ..... 7

III. FACTUAL BACKGROUND ..... 9

A. Seabed Mineral Exploration and Extraction Activities Will Harm Imperiled Wildlife. ..... 9

B. NMFS Concludes Seabed Mining Leasing off the Mariana Islands Will Not Adversely Affect ESA-Listed Species or Critical Habitat. ..... 11

IV. STANDARD OF REVIEW ..... 15

V. ARGUMENT ..... 16

A. NMFS Violated ESA Section 7's Mandate to Evaluate the Entire Agency Action. ..... 17

B. Even Assuming *Arguendo* that Post-Leasing Activities Were Not Part of the Agency Action, NMFS Would Still Be Obligated to Consider Their Effects. ..... 18

C. NMFS Did Not Comply with the Legal Requirements for Incremental-Step Consultation. ..... 21

D. NMFS Failed to Evaluate the Full Scope of Effects from Preliminary Activities. ..... 22

VI. THE COURT SHOULD VACATE THE LETTER OF CONCURRENCE ..... 26

VII. CONCLUSION ..... 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ....................17, 18, 27

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....................25

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) ....................5, 15

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
No. CV-24-00141-TUC-RM, 2026 WL 878924 (D. Ariz. Mar. 31, 2026) ....................26

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
Case No. 24-cv-04651-JST, 2026 WL 898264 (N.D. Cal. Mar. 30, 2026) ....................4

*Env't Def. Ctr. v. BOEM*,
36 F.4th 850 (9th Cir. 2022) ....................22

*Los Padres ForestWatch v. U.S. Forest Serv.*,
25 F.4th 649 (9th Cir. 2022) ....................25

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ....................26, 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ....................15, 18

*N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) ....................17, 21, 22

*Nat'l Parks Conservation Ass'n v. Semonite*,
422 F. Supp. 3d 92 (D.D.C. 2019) ....................27

*Nat'l Wildlife Fed'n v. NMFS*,
524 F.3d 917 (9th Cir. 2008) ....................25, 26

**Page(s)**

**CASES (Continued)**

*Nw. Coal. for Alternatives to Pesticides v. U.S. EPA*,
544 F.3d 1043 (9th Cir. 2008) ..........16

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) ..........17

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) ..........4

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ..........19

*Sierra Club v. NMFS*,
797 F. Supp. 3d 440 (D. Md. 2024)..........22, 23, 24

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)..........3

*Wash. Toxics Coal. v. U.S. Dep't of Interior*,
457 F. Supp. 2d 1158 (W.D. Wash. 2006) ..........23

**UNITED STATES CODE**

5 U.S.C. § 706(2)(A)..........15

16 U.S.C. § 1532(16) ..........9

16 U.S.C. § 1533(a) ..........3

16 U.S.C. § 1536(a)(2)..........3, 4

16 U.S.C. § 1536(b)(3)(A)..........6, 23

16 U.S.C. § 1536(b)(4)..........6

16 U.S.C. § 1536(c)(1)..........5

43 U.S.C. § 1301(a)(2)..........7

43 U.S.C. § 1331 *et seq.*..........7

**Page(s)**

**UNITED STATES CODE (Continued)**

43 U.S.C. § 1331(a) .......... 7

43 U.S.C. § 1337(k) .......... 7

**CODE OF FEDERAL REGULATIONS**

30 C.F.R. pt. 581 .......... 7

30 C.F.R. § 581.19 .......... 8

30 C.F.R. § 582.3 .......... 8

30 C.F.R. § 582.21(a) .......... 8

30 C.F.R. § 582.21(d) .......... 8

30 C.F.R. § 582.22 .......... 8

30 C.F.R. § 582.23 .......... 8

30 C.F.R. § 582.24 .......... 8

50 C.F.R. § 402.01(b) .......... 4

50 C.F.R. § 402.02 .......... 3, 4, 12, 19, 20

50 C.F.R. § 402.12(a) .......... 5

50 C.F.R. § 402.13(c) .......... 5

50 C.F.R. § 402.14 .......... 4

50 C.F.R. § 402.14(a) .......... 5, 6

50 C.F.R. § 402.14(b)(1) .......... 5

50 C.F.R. § 402.14(c) .......... 6

50 C.F.R. § 402.14(d) .......... 6

50 C.F.R. § 402.14(e) .......... 6

**Page(s)**

**CODE OF FEDERAL REGULATIONS (Continued)**

50 C.F.R. § 402.14(f) ....................6

50 C.F.R. § 402.14(g) ....................6

50 C.F.R. § 402.14(h) ....................6

50 C.F.R. § 402.14(i)(1)....................6

50 C.F.R. § 402.14(k) ....................6, 7, 21

50 C.F.R. § 402.14(k)(5)....................7, 22

**FEDERAL REGISTER**

48 Fed. Reg. 10605 (Mar. 14, 1983)....................7

51 Fed. Reg. 19926 (June 3, 1986) ....................21

61 Fed. Reg. 4722 (Feb. 7, 1996) ....................9

90 Fed. Reg. 50872 (Nov. 12, 2025)....................11, 19

91 Fed. Reg. 53422 (Aug. 18, 2026)....................15

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 201 ....................9

**OTHER AUTHORITIES**

Secretarial Order 3451, *Establishment of the Marine Minerals Administration* (July 10, 2026) ....................7

U.S. Fish and Wildlife Serv, & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* (1998)....................*passim*

# I. INTRODUCTION

This summer, the Marine Minerals Administration (MMA) made an unprecedented move to open the U.S. waters to deep-sea mining for the first time ever. The second location for its experiment (following American Samoa) is nearly 70 million acres of seabed surrounding the Mariana Islands. Mineral development and production activities on the leases would devastate the marine ecosystems that are the foundation of treasured *Refaluwasch* (Carolinian) and *CHamoru* (Chamorro) traditions and practices. These communities have preserved and continue to practice traditional marine navigation techniques to traverse the waters around their home. These practices rely on healthy populations of marine mammals, sea turtles, sharks, and other wildlife—many of which are listed as endangered or threatened under the Endangered Species Act (ESA)—who serve as guides and place markers in the open waters around the Mariana Islands.

Before MMA can hold its lease sale, the ESA requires it to complete consultation with the National Marine Fisheries Service (NMFS) to ensure that activities under the leases will not push those imperiled species closer to extinction or destroy their critical habitats. Last month, NMFS issued a final determination (Letter of Concurrence or LOC) that MMA's proposed lease sale off the Commonwealth of the Northern Mariana Islands (CNMI) and Guam is not likely to adversely affect any ESA-protected species or critical habitat, granting its ESA

authorization for MMA to hold the sale. As it did for the American Samoa lease sale, NMFS ignored nearly all the effects of MMA's action in the Mariana Islands. NMFS omitted the very exploration, testing, development, and mining activities that the lease sale aims to generate, considering the effects from only a narrow set of "preliminary activities" on leases. But the ESA requires NMFS to evaluate *all* effects of leasing—including post-leasing activities—when determining whether MMA's action is likely to adversely affect protected species and habitats. NMFS blatantly violated that requirement here. Even for the preliminary activities it did consider, NMFS failed to address many of the ways in which those activities can harm ESA-listed species.

Because the consultation failed to evaluate the extent to which mineral leasing will harm protected species and the environment, Plaintiffs ask the Court to vacate and remand NMFS's arbitrary and unlawful LOC before MMA can rely on it to hold the planned lease sale on December 16, 2026.[1]

[1] NMFS's LOC adversely affects the professional, scientific, educational, aesthetic, spiritual, and cultural interests of Plaintiffs' members. *See* Arriola, Muña, Perez, Raiukiulipiy, Peters, Nakachi, Zgliczynski, Monsell, and Kerr Declarations, which are attached to Plaintiffs' Concise Statement, filed herewith. Plaintiffs bring this motion to protect their members' interests.

## II. STATUTORY FRAMEWORK

### A. Endangered Species Act

Congress enacted the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered and designating "critical habitat" to protect areas that are essential to the species' survival and recovery. 16 U.S.C. § 1533(a).

Section 7(a)(2) of the ESA requires every federal agency to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." *Id.* § 1536(a)(2).[2] If a federal action "may affect" any ESA-listed species or critical habitat, the agency proposing the action (the action agency) must complete a consultation with the appropriate wildlife service—the U.S. Fish and Wildlife

[2] To "jeopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

Service (FWS) or, as here, NMFS—to ensure compliance with section 7(a)(2)'s mandate. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.14.

Consultation must analyze all effects of the entire agency action, which include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018).[3] "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification." *Id.* "Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

Both the action agency and NMFS must "use the best scientific and commercial data available" when evaluating effects. 16 U.S.C. § 1536(a)(2). The action agency first prepares a biological assessment to "evaluate the potential

[3] On March 30, 2026, the U.S. District Court for the Northern District of California held that the definition of "effects of the action" promulgated in 2019 was facially invalid and reinstated the definition that was in effect prior to 2019. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, Case No. 24-cv-04651-JST, 2026 WL 898264, at *15, *25 (N.D. Cal. Mar. 30, 2026). The Letter of Concurrence applies the pre-2019 regulations, and they govern here. Ex. 3: Letter of Concurrence (LOC) 1–2; *see Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.").

effects of [its] action" and "determine whether [listed] species or [critical] habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a); *see* 16 U.S.C. § 1536(c)(1). If the action agency determines *and* NMFS concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat, "the consultation process is terminated, and no further action [under section 7(a)(2)] is necessary." 50 C.F.R. § 402.13(c); *see also id.* § 402.14(a), (b)(1).

NMFS's concurrence letter must, at a minimum, document its own "analysis, based on review of all potential effects, direct and indirect." FWS & NMFS, *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*];[4] *cf. Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* (*BLM*), 698 F.3d 1101, 1113 (9th Cir. 2012) (relying on *ESA Handbook* to determine "effects of the action"). "[I]f any adverse effect to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions," NMFS is required to conclude that the action "[i]s likely to adversely affect" species. *ESA Handbook* 3-13.

[4] For the Court's convenience, excerpts from the *ESA Handbook*—on which NMFS relied in issuing the LOC—are attached as Exhibit "2" to Plaintiffs' Concise Statement. *See* LOC at 13.

If NMFS does not concur that the action is not likely to adversely affect listed species or critical habitat, then "formal consultation" is required. 50 C.F.R. § 402.14(a). Formal consultation involves a more comprehensive evaluation of the effects of the action and culminates in a "biological opinion" from NMFS on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h). If NMFS concludes jeopardy or adverse modification is likely, it must specify reasonable and prudent alternatives that would avoid such jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A). In addition, each biological opinion must include an "incidental take statement" that, among other things, requires ongoing monitoring of harm to species, as well as measures "to minimize [the] impact of" the action on listed species. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(i)(1).

The ESA regulations provide for consultation to occur in stages "[w]hen the action is authorized by a statute that allows the [action] agency to take incremental steps toward the completion of the action." 50 C.F.R. § 402.14(k). When such a statute is involved, NMFS "shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered." *Id.* In its biological opinion, NMFS must "includ[e] its views on the entire action," *id.*—not just the first incremental step—and determine, among other things, whether "[t]here is a

reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." *Id.* § 402.14(k)(5). Consultation for the first phase of an incremental-step action always must be conducted formally, concluding with a biological opinion. *Id.* § 402.14(k); *ESA Handbook* 5-8.

B. Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act (OCSLA) governs the leasing, exploration, and development of minerals on the "Outer Continental Shelf." 43 U.S.C. § 1331 *et seq.* OCLSA defines the Outer Continental Shelf as the seabed extending from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605, 10605 (Mar. 14, 1983). OCSLA authorizes MMA to sell "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k); *see* 30 C.F.R. pt. 581.[5]

[5] Until recently, the agency within the Department of the Interior with authority for OCSLA leasing was named the Bureau of Ocean Energy Management (BOEM). In July, the Secretary of the Interior merged BOEM and the Bureau of Safety and Environmental Enforcement into a single agency now called the Marine Minerals Administration. Secretarial Order 3451, *Establishment of the Marine Minerals Administration* (July 10, 2026) https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-minerals-administration_final_508.pdf. While the applicable regulations and the record in this case refer to BOEM, this briefing will use MMA, the agency's current name.

Immediately upon receiving a lease, the holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." 30 C.F.R. § 582.21(d). Such activities are, by definition, "those which have no significant adverse impact on the natural resources of the [Outer Continental Shelf (OCS)]," *id.*, but lessees are permitted to commence preliminary activities without obtaining MMA's approval that they meet that environmental standard.

Lessees then conduct further exploration, testing, development, and production activities on a lease "in accordance with a plan submitted by the lessee and approved by the Director" of MMA. *Id.* § 582.21(a). "Exploration" includes certain geophysical surveys, drilling, and sampling of mineral deposits. *Id.* § 582.3; *see id.* § 582.22. "Testing" includes "removing bulk samples for processing tests and feasibility studies and/or the testing of mining equipment." *Id.* § 582.3; *see id.* § 582.23. "Development" includes "geophysical activities, drilling, construction of offshore facilities, and operation of all onshore support facilities" for the purpose of producing minerals. *Id.* § 582.3; *see id.* § 582.24. And "production" is the mining and processing of minerals from the seabed. *Id.* § 582.24. While leases have a primary term of at least 20 years, they remain in effect beyond that term so long as minerals are being produced. *Id.* § 581.19.

## III. FACTUAL BACKGROUND

### A. Seabed Mineral Exploration and Extraction Activities Will Harm Imperiled Wildlife.

The waters around the Mariana Islands are home to fourteen species that the ESA protects and that NMFS determined may be affected by MMA's planned lease sale: the endangered blue whale, fin whale, sei whale, sperm whale, humpback whale (Western North Pacific Distinct Population Segment (DPS)),[6] green sea turtle (Central West Pacific DPS), hawksbill sea turtle, loggerhead sea turtle (North Pacific DPS), and leatherback sea turtle, and the threatened olive ridley sea turtle, oceanic whitetip shark, giant manta ray, scalloped hammerhead shark (Indo-West Pacific DPS), and *Acropora globiceps* coral. Ex. 2: Biological Assessment (BA) at 105–106; LOC at 4–6; Ex. 4: NOAA Fisheries, *Marine Protected Species of Mariana Islands*[7]. NMFS has designated critical habitat in

[6] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

[7] Pursuant to Federal Rule of Evidence 201, Plaintiffs respectfully request that the Court take judicial notice of Exhibit 4, which is a screenshot of NMFS's webpage entitled, "Marine Protected Species of Mariana Islands." *See* Eaton Decl. ¶ 5. During the LR 7.8 conference regarding Plaintiffs' motion for summary judgment, Defendants stated that they do not object to the Court taking judicial notice of Exhibit 4.

the coastal waters of Guam and CNMI for *Acropora globiceps*. BA at 80, 106. And NMFS has identified nearly forty additional species of ESA-listed whales, pinnipeds, sea turtles, and other marine animals that may be affected by vessels traveling to and from activities in the proposed lease areas. LOC at 4–10; BA at 105–109.

Seabed mineral exploration and extraction activities can harm ESA-listed species and their habitats in multiple ways. Operation of mining equipment, whether during testing or extraction, releases harmful sediment plumes into the water column. BA at 18 ("Sediment plumes are a known concern from commercial-scale mining … ."). For example, collector vehicles stir up sediment as they move along the seafloor. *Id.* at 118 (stating collector-vehicle mining tests "disturb orders-of-magnitude" more sediment than preliminary activities). These sediment plumes can harm marine life such as imperiled marine mammals, sea turtles, sharks, rays, and corals.

Exploration activities use acoustic equipment and physical sampling to survey the contours and composition of the seabed. *E.g.*, *id.* at 13. Acoustic surveys emit loud pulses of sound that can deafen whales and other animals in the area or cause "behavioral disturbance, resulting in interruption or cessation of important behaviors such as migration, feeding, resting, communication, or breeding." *Id.* at 82. Acoustic surveys may be conducted 24 hours a day over

several days. *Id.* at 21. Physical sampling is typically done by lowering collector equipment from a surface vessel or remotely operated vehicle (ROV) to extract a sample of sediment and/or minerals. *Id.* at 16–20. The lines connected to sampling equipment can entangle animals. *Id.* at 91–92.

The vessels conducting activities at every phase of the process also threaten harm to ESA-listed wildlife. Vessels can strike and kill or injure marine animals anywhere along their voyage, from mining or exploration sites to distant ports. *Id.* at 90. Noise from vessels can mask communication among marine mammals and impair their ability to find food. *Id.* at 86–87. Vessels also spill oil, debris, and other pollutants that harm marine wildlife. *Id.* at 93–95. These impacts are likely to become more intense in an area as exploration turns to ongoing mining operations.

### B. <u>NMFS Concludes Seabed Mining Leasing off the Mariana Islands Will Not Adversely Affect ESA-Listed Species or Critical Habitat.</u>

On November 12, 2025, MMA commenced a process to sell mining leases off the Mariana Islands with publication of a "Request for information and interest." 90 Fed. Reg. 50872 (Nov. 12, 2025). After receiving over 65,500 comments, the overwhelming majority of which cited major environmental harms from leasing, MMA announced an "Area ID" that proposed to lease over 35

million acres to the east of the Mariana Islands and over 33 million acres to the west. BA at 8; *id.* app. A1 at 2–3, 5, 7–8.

On July 22, 2026, NMFS received a request from MMA for "expedited informal consultation" on MMA's "proposed action to issue up to six leases for the purpose of commercial mining" in the Mariana Islands. LOC at 1. MMA sought NMFS's concurrence that its action "may affect, but is not likely to adversely affect" approximately 60 ESA-listed species, avoiding the need to engage in formal consultation under ESA section 7. *Id.* at 4; *see id.* 4–10. MMA provided NMFS with a biological assessment in support of its request. *See generally* BA.

The BA identifies the "action area"—the "areas to be affected directly or indirectly by the federal action"—as "two areas, east and west of the CNMI where most of the Proposed Action will occur," as well as "two additional areas to account for possible vessels transiting from Hawai'i and the U.S. West Coast." *Id.* at 23, 25 (citing 50 C.F.R. § 402.02).




**Figure 1. Map of the Proposed Action, which includes the CNMI OCS, Hawaiian waters, and the U.S. West Coast**

*Id.* at 9. Despite stating that the "need" for the lease sale is to "is to help meet U.S. demand for critical minerals," *id.* at 10, the BA limits the "effects of the action" to only "preliminary activities"; it completely omits effects from exploration, testing, development, and/or mining on leases. *See id.* at 82–103, 117 (noting that preliminary activities "would not result in commercial-scale disturbance").

The scope of preliminary activities includes the use of High-Resolution Geophysical (HRG) surveys (e.g., multibeam echosounders, side-scan sonar, and

sub-bottom profilers), seabed sampling by ROVs, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions. *Id.* at 14–20. The BA identifies several ways in which these activities harm ESA-listed marine mammals, sea turtles, sharks, and rays, including: noise from surveys, aircraft, and vessels; vessel collisions; entanglement in mooring systems for buoys and deep-tow survey systems; disturbance to feeding or modified prey abundance; habitat disturbance; and release of pollutants and marine debris. *Id.* at 82–103. MMA nonetheless concluded the consequences of each effect would be "insignificant." *Id.* The BA also paradoxically concludes there will be "no effect" to ESA-listed coral (*A. globiceps*) but that its critical habitat may be affected because it "overlaps with the Action Area." *Id.* at 103, 106. Ultimately, the BA concludes the action "may affect but [is] not likely to adversely affect" any ESA-listed species or critical habitat. *Id.* at 104.

On August 10, 2026, NMFS issued a short letter concurring with MMA's determination. LOC at 4. Like the BA, the LOC considers only preliminary activities; it does not contain any evaluation of the effects of exploration, testing, development, or production. *Id.* at 3. And, of the effects from preliminary activities, the LOC discusses only acoustic impacts from surveys, ignoring all other potential impacts flagged in the BA. *Id.* For those surveys, the LOC Concurrence assumes that all operations "are strictly limited to Tier 4 sound sources as defined

by (Ruppel et al. 2022) and *de minimis*" and that "[t]he use of high-impact, medium-penetration, or non-Tier 4 acoustic equipment is prohibited." *Id.*

The LOC states that NMFS's concurrence "concludes informal consultation under section 7 of the ESA" for the proposed Mariana Islands lease sale. *Id.* at 10. MMA has since published a Proposed Leasing Notice to hold the sale on December 16, 2026. 91 Fed. Reg. 53422 (Aug. 18, 2026).

## IV. STANDARD OF REVIEW

The APA governs review of agency decisions under the ESA. *BLM*, 698 F.3d at 1109. Under the APA, an agency action is invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (cleaned up). "[W]here the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [a court]

must disapprove the agency's action." *Nw. Coal. for Alternatives to Pesticides v. U.S. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008).

## V. ARGUMENT

The ESA requires NMFS to make an independent, well-reasoned determination whether the effects from the entire agency action are likely to adversely affect any ESA-listed species or critical habitat. It is well-established under Ninth Circuit caselaw that the entire agency action for an OCSLA lease sale includes all post-leasing activities. But NMFS did not look beyond the narrow preliminary activities that occur on a lease here. It completely ignored the most significant effects of the action, which are from exploration, development, testing, and commercial mining. Even if those activities were not part of the action—and they are—NMFS would still have to consider and evaluate the effects of post-leasing activities as indirect effects or as effects of interdependent or interrelated actions before determining whether MMA's action is likely to have adverse impacts on ESA-listed species. While NMFS may try to justify its approach as an "incremental-step" consultation under the ESA regulations, it violated the legal requirements to produce a biological opinion and to express its views on the entire action at the first step: the lease sale. Finally, even if NMFS legally could limit the scope of its consultation to only the preliminary activities on a lease, its LOC does not even address the full scope of effects from those first-step activities.

Simply put, NMFS's LOC violates the ESA because the agency failed to consider all effects of MMA's action.

A. NMFS Violated ESA Section 7's Mandate to Evaluate the Entire Agency Action.

ESA section 7 requires NMFS to evaluate "the effect of the *entire* agency action." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988). NMFS blatantly violated that mandate.

For a "lease sale under the Outer Continental Shelf Lands Act, … the 'agency action' encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production." *Id.* (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980)). For an OCLSA oil and gas lease, "[e]valuating an outer continental shelf project in the light of all contemplated and congruous actions merely reflects that 'pumping oil' and not 'leasing tracts' is the aim of congressional [OCSLA] policy." *N. Slope Borough*, 642 F.2d at 608. Likewise, for a deep-sea mining lease, "section 7 of the ESA on its face requires [NMFS] in this case to consider all phases of the agency action, which includes post-leasing activities." *Conner*, 848 F.2d at 1453; *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994) ("[T]here is little doubt that Congress intended to enact a broad definition of agency action in the ESA … ."); *cf.* BA, app. A1 at 1 (MMA is offering the Marianas lease sale in

response to executive orders "to facilitate and expedite critical minerals permitting, leasing, and ultimately development of critical minerals on the OCS").

NMFS did not consider any post-leasing activities here. Neither the LOC nor the BA on which NMFS based its letter analyzes the potential for post-leasing exploration, development, testing, and mining activities to inflict harm on any of the scores of ESA-listed species that NMFS and MMA identified as being in the Action Area. *See* BA at 18, 118 (noting impacts from post-leasing activities). Because NMFS's LOC did not evaluate "the effect of the *entire* agency action," it violates ESA section 7(a)(2). *Conner*, 848 F.2d at 1453. NMFS's failure "to consider an important aspect of the problem" further renders its LOC "arbitrary and capricious," in violation of the APA. *State Farm*, 463 U.S. at 43.

B. Even Assuming *Arguendo* that Post-Leasing Activities Were Not Part of the Agency Action, NMFS Would Still Be Obligated to Consider Their Effects.

Even if one were to assume that post-leasing activities were not part of the agency action—and, under binding precedent, they are—NMFS would still be obligated to consider the impacts of all post-leasing activities before deciding whether to concur with MMA's "not likely to adversely affect" assessment. "Effects of the action" include not only direct effects, but also "indirect effects" of the action and the effects of "other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018). Even if exploration, development,

testing, and mining of a lease were not part of MMA's action, they would meet the definitions of these types of effects.

Post-leasing activities are indirect effects of MMA's proposed lease sale because they are "caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* "[A]n indirect effect—as envisioned by 50 C.F.R. § 402.02—is one that the action makes possible (or indeed, more probable), but does not directly cause." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014). It cannot be disputed that a mineral lease sale makes exploration, development, testing, and mining both possible and more probable; no post-leasing activities can occur unless a lease is issued first. Indeed, MMA's stated objective in holding the lease sale is to "help meet U.S. demand for critical minerals." BA at 10; *see also id.*, app. A1 at 1 (same); 90 Fed. Reg. at 50873 (stating lease sale's purpose is "to accelerate the responsible development of OCS mineral resources [and] ensure secure supply chains"). And NMFS identified the proposed action as "leases *for the purpose of* commercial mining." LOC at 1 (emphasis added). Because the entire justification for leasing is to cause the future development and recovery of minerals, the impacts of those post-leasing activities are indirect effects that NMFS was obligated to consider, even if the activities were not deemed part of MMA's action. *See ESA Handbook* 4-29 (stating "other

Federal actions" are "indirect effects" if they "are a logical extension of the proposed action").

Alternatively, post-leasing activities meet the definition of interrelated or interdependent actions. As NMFS has explained elsewhere, if "the activity in question would not occur but for the proposed action, then the activity is interrelated or interdependent and should be analyzed with the effects of the action." *Id.* at 4-27. But for the sale of leases, exploration, development, testing, and mining cannot occur; they satisfy the "but for" test. Moreover, post-leasing activities are "interdependent" because they "have no independent utility apart from the action under consideration"; they cannot exist without first holding a lease sale. 50 C.F.R. § 402.02. And all phases of OCSLA development—from leasing through exploration through mining—are interrelated because they "are part of a larger action and depend on the larger action for their justification," namely mineral extraction. *Id.*

Whether characterized as direct or indirect effects or as effects of interrelated or interdependent actions, NMFS was required to evaluate exploration, development, testing, and mining as effects of the action. NMFS's failure to do so in its concurrence determination violates the ESA and renders its LOC arbitrary and unlawful.

C. NMFS Did Not Comply with the Legal Requirements for Incremental-Step Consultation.

Insofar as NMFS may claim that the consultation here is an incremental-step consultation, the ESA regulations required NMFS to complete formal consultation and issue a biological opinion at the first step: the lease sale. 50 C.F.R. § 402.14(k). NMFS's issuance of a concurrence following expedited informal consultation does not comply with the law.

When NMFS and FWS promulgated ESA regulations in 1986, they added a process for incremental-step consultation if an "action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action." 51 Fed. Reg. 19926, 19955, 19962 (June 3, 1986) (codified at 50 C.F.R. § 402.14(k)). The agencies explained that this process was specifically meant to reflect the consultation process on OCSLA actions that had been "sanctioned by the court in" *North Slope Borough*. *Id.* at 19955 (citing 642 F.2d 589).

The LOC does not expressly state whether MMA requested an incremental-step consultation, which is a condition for applying the procedures. *See* 50 C.F.R. § 402.14(k). Even if MMA did request such a consultation, NMFS failed to comply with the regulation's requirements. NMFS did not "issue a biological opinion on the incremental step being considered"—the lease sale—as the regulation mandates. *Id.*; *see also ESA Handbook* 5-8 ("[C]onsultation for the first phase of an incremental step action must be conducted formally."). Moreover, as

discussed above, NMFS failed to provide "its views on the *entire* action," including its assessment whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." 50 C.F.R. § 402.14(k)(5) (emphasis added); *cf. N. Slope Borough*, 642 F.2d at 608 ("[A] 'biological opinion' may not deal exclusively with any one particular stage of an outer continental shelf project."). Incremental-step consultation cannot justify NMFS's failure to include the full scope of the action and its effects here. *Cf. Env't Def. Ctr. v. BOEM*, 36 F.4th 850, 890 (9th Cir. 2022) ("Site-specific review cannot cure a failure to consult at the programmatic level … .").

D. NMFS Failed to Evaluate the Full Scope of Effects from Preliminary Activities.

Even if NMFS lawfully could limit its consideration of effects to only those from preliminary activities—and it could not—even its conclusion on those initial activities is arbitrary and contrary to the ESA. NMFS failed to evaluate the full scope of those activities, assessing only effects from acoustic surveys. And its determination that acoustic surveys will not have adverse effects unlawfully relies on hypothetical, nonbinding limits on operations.

The ESA requires NMFS as the expert wildlife agency to independently "evaluat[e] the potential for effect" before concurring in a not likely to adversely affect determination. *ESA Handbook* 3-12; *see, e.g.*, *Sierra Club v. NMFS*, 797 F.

Supp. 3d 440, 456–60 (D. Md. 2024) (holding "NMFS unlawfully deferred to BOEM's conclusion" about effects "rather than make an independent determination of its own"). NMFS's duty to do its own independent assessment of effects is rooted in section 7: "Promptly after conclusion of consultation under [section 7(a)], the Secretary shall provide to the Federal agency … a written statement setting forth *the Secretary's opinion*, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A) (emphasis added); *cf. Wash. Toxics Coal. v. U.S. Dep't of Interior*, 457 F. Supp. 2d 1158, 1179 (W.D. Wash. 2006) (citing that provision in holding that action agency may not make unilateral "no effect" determination). In line with this provision, the ESA Handbook requires that, in an informal consultation, NMFS's "analysis, based on review of all potential effects, direct and indirect, is documented in the concurrence letter." *ESA Handbook* 3-12.

The LOC does not document an analysis of "all potential effects" from preliminary activities, but rather only those from "acoustic operations." The BA indicates preliminary activities will also affect ESA-listed species through vessel noise, vessel collisions, entanglement in mooring systems, disturbance to feeding and prey abundance, habitat disturbance, and release of pollutants and marine debris. BA at 82–103. Contrary to ESA section 7's mandate, NMFS's LOC is

silent regarding why NMFS agreed with MMA's assessment that these stressors would not be likely to adversely affect ESA-listed species.

In other OCLSA contexts, NMFS has reached contrary conclusions. For example, NMFS recently determined that, although "[t]he amount of trash and debris that would enter the marine environment" from oil and gas operations in the Gulf "is expected to be minimal," Ex. 5: 2025 Gulf Biological Opinion at 466, marine debris nonetheless threatens sperm whales and loggerhead, green, and leatherback sea turtles—the same species present in the Mariana Islands—with "injury, infection, or death," *id.* at 467; *see id.* at 466–74.[8] NMFS's LOC does not explain why NMFS concluded that minimal additions of marine debris are likely to adversely affect ESA-listed whales and turtles in the Gulf, *id.* at 296, but agreed with MMA's contrary assessment here. *See* BA at 94 (claiming that, because "the amount of trash and debris dumped offshore would be expected to be minimal," effects to ESA-listed species "are expected to be insignificant"), 105–106 (making "NLAA" determinations for these species); *cf. Sierra Club*, 797 F. Supp. 3d at 459, 494–95 (vacating NMFS's biological opinion where "the expert agency's own view was that there were serious reasons to doubt the soundness of BOEM's methods and conclusion—and the expert agency did not explain why it deferred in

[8] Defendants have confirmed that NMFS's 2025 Gulf Biological Opinion is in the administrative record for NMFS's LOC. Eaton Decl. ¶ 6.

spite of them"). The LOC's conclusory statements do not demonstrate that NMFS meaningfully evaluated any of these effects prior to reaching its concurrence determination. *See Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) ("[A]n agency's determination is arbitrary and capricious where it merely provides 'generic statements' to support its conclusion in lieu of evidence that it has actually applied its substantive expertise." (citation omitted)).

While the LOC does include NMFS's cursory assessment of effects from acoustic operations, NMFS's conclusion with respect to those activities violates the ESA because it relies on nonbinding mitigation. NMFS concluded that such operations will not adversely affect species based on NMFS's assumption that such operations "are strictly limited to Tier 4 sound sources as defined by (Ruppel et al. 2022)" and that "[t]he use of high-impact, medium-penetration, or non-Tier 4 acoustic equipment is prohibited." LOC at 3. NMFS may not, however, rely on such mitigation for its determination "absent specific and binding plans" to implement the mitigation. *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 935–36 & n.17 (9th Cir. 2008); *see also Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (stating mitigation measures "must be subject to deadlines or otherwise-enforceable obligations" (citation omitted)). There is no evidence in MMA's BA or any other publicly available documentation on the Mariana Islands lease sale that MMA has specific and binding plans to implement the referenced

criteria.[9] On the contrary, none of the Best Management Practices listed in the BA (that MMA will make enforceable "through lease stipulations to minimize potential impacts to ESA-listed species," BA at 2) contains *any* criteria for the operation of acoustic equipment, *see id.* App'x B. NMFS's reliance on hypothetical, nonbinding criteria for its concurrence determination violates the ESA. *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

## VI. THE COURT SHOULD VACATE THE LETTER OF CONCURRENCE.

The "default remedy under the APA" for an unlawful agency action is vacatur and remand of the action. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). In "limited circumstances," a court may instead remand without vacatur. *Id.* Whether circumstances warrant departure from vacatur "depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (citation omitted). Neither factor warrants remand without vacatur here.

NMFS's errors are serious. It completely omitted the bulk of effects of the action from its assessment. "There is no 'serious possibility that the [government]

[9] "When final agency action, such as a Concurrence, relies on a Biological Assessment to conclude that no further consultation is necessary, however, a court may also review the underlying Biological Assessment." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV-24-00141-TUC-RM, 2026 WL 878924, at *5 (D. Ariz. Mar. 31, 2026).

will be able to substantiate its decision'" on the scope of effects on remand because the law prohibits NMFS's approach. *Id.* at 51 (citation omitted) (alteration in original). Moreover, vacatur would have minimal disruptive consequences, if any. MMA has not yet held its lease sale, which is planned for December 16, 2026. Vacating the LOC before that date would allow MMA to postpone or cancel the sale pending completion of lawful ESA consultation. Defendants cannot meet their "burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

## VII. CONCLUSION

"The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species" to prevent "a violation of the ESA's substantive provisions." *Conner*, 848 F.2d at 1457 n.40 (citation omitted). NMFS's limited effects determination fails that requirement. The Court should hold that the LOC is arbitrary and capricious and contrary to the ESA and its implementing regulations, and vacate and remand the LOC.

DATED: October 2, 2026.

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436

Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Our Common Wealth 670, PåganWatch,
Conservation Council for Hawai‘i, and
Center for Biological Diversity

CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.4(e), I certify that the foregoing memorandum in support of summary judgment is set in a proportionally spaced 14-point font (Times New Roman) and contains 6,034 words, exclusive of the caption and signature block. I have relied upon Microsoft Word to determine the word count.

DATED: October 2, 2026.

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs