DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| OUR COMMON WEALTH 670, PÅGANWATCH, CONSERVATION COUNCIL FOR HAWAIʻI, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States,<br><br>Defendants. | CIVIL NO. CV-26-469 JAO-KJM<br><br>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>Judge: Hon. Jill A. Otake<br><br>Trial Date: None Set<br><br>Related to ECF 27 |

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


I. INTRODUCTION ........................................ 1

II. ARGUMENT ........................................ 1

A. NMFS Violated the ESA's Mandate to Evaluate the Entire Agency Action. ........................................ 1

1. NMFS Violated Requirements for "Staged Consultation." ........ 2

2. NMFS Lacks Any Support for the Cramped Consultation Approach Taken Here. ........................................ 7

B. Even If Post-Leasing Activities Were Not Part of the Agency Action, NMFS Would Still Be Obligated to Evaluate Their Effects. ........................................ 12

C. NMFS's Evaluation of Effects from Preliminary Activities Is Arbitrary and Contrary to the ESA. ........................................ 15

1. Marine Debris ........................................ 15

2. Non-Binding Mitigation of Acoustic Harms ........................................ 18

III. THE COURT SHOULD VACATE THE LETTER OF CONCURRENCE ........................................ 19

IV. CONCLUSION ........................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) .......... 8

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......... *passim*

*Ctr. for Biological Diversity v. Haaland*,
87 F.4th 980 (9th Cir. 2023) .......... 14

*Ctr. for Biological Diversity v. U.S. Dep't of Interior* (*CBD*),
563 F.3d 466 (D.C. Cir. 2009) .......... 11, 12

*Defs. of Wildlife v. Zinke*,
856 F.3d 1248 (9th Cir. 2017) .......... 16

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .......... 6

*Fisheries Survival Fund v. Haaland*,
858 F. App'x 371 (D.C. Cir. 2021) .......... 12

*Greenpeace v. NMFS*,
80 F. Supp. 2d 1137 (W.D. Wash. 2000) .......... 7

*Healthy Gulf v. U.S. Dep't of the Interior*,
152 F.4th 180 (D.C. Cir. 2025) .......... 11

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .......... 16, 17

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) .......... 19, 20

*N. Slope Borough v. Andrus*,
486 F. Supp. 332 (D.D.C. 1980) .......... 2, 3

*N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) .......... 3, 8, 10

Page(s)

**CASES (Continued)**

*Nat'l Wildlife Fed'n v. NMFS*,
524 F.3d 917 (9th Cir. 2008) ....................18, 19

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ....................11

*Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Management*,
No. 1:13-cv-01988-JLK, 2018 U.S. Dist. LEXIS 163703 (D. Colo. Sept. 11, 2018) ....................12, 13

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ....................8, 9

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ....................13

*Save Long Beach Island v. U.S. Dep't of the Interior*,
663 F. Supp. 3d 1 (D.D.C. 2023) ....................11, 12

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) ....................7

*Tribal Village of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988) ....................4

*Vill. of False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984) ....................3

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) ....................8

**UNITED STATES CODE**

16 U.S.C. § 1536(a)(2) ....................9, 19

43 U.S.C. § 1331(c) ....................14

43 U.S.C. § 1337(k) ....................14

**Page(s)**

## CODE OF FEDERAL REGULATIONS

30 C.F.R. § 582.21(d) ....................18

50 C.F.R. § 402.02 (2018) ....................12

50 C.F.R. § 402.13(c)....................19

50 C.F.R. § 402.14(b)(1)....................19

50 C.F.R. § 402.14(k) ....................5

## FEDERAL REGISTER

51 Fed. Reg. 19926 (June 3, 1986) ....................5, 15

90 Fed. Reg. 17735 (Apr. 29, 2025) ....................10, 14

90 Fed. Reg. 50872 (Nov. 12, 2025)....................13

## OTHER AUTHORITIES

U.S. Fish and Wildlife Serv, & Nat'l Marine Fisheries Serv.,
*Endangered Species Consultation Handbook* (1998)....................5, 13, 17

## I. INTRODUCTION

Defendants claim the National Marine Fisheries Service (NMFS) engaged in a lawful "staged" Endangered Species Act (ESA) consultation. But no court has ever upheld what NMFS did here: an informal consultation on an Outer Continental Shelf Lands Act (OCSLA) lease sale whose scope considered only preliminary activities. On the contrary, binding precedent and Defendants' own caselaw establish that consultation on a lease sale must include post-leasing activities like exploration, development, and extraction. NMFS's unprecedented approach to consultation for the Mariana Islands lease sale violates well-established law.

## II. ARGUMENT

### A. NMFS Violated the ESA's Mandate to Evaluate the Entire Agency Action.

Binding Ninth Circuit precedent requires NMFS to evaluate "the effect of the *entire* agency action," which, in the case of a "lease sale under [OCSLA], … encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980)). Defendants do not dispute that NMFS did not do that here. Rather, they claim NMFS engaged in permissible "staged consultation." ECF 34,

PageID.1413-14. But NMFS's narrow evaluation of only preliminary activities is nothing like the lease sale consultations that courts have sanctioned. The cases Defendants cite all involved *formal* consultation culminating in a *biological opinion* that *included* post-leasing activities. None involved an *informal* consultation culminating in a *letter of concurrence* that *did not include* post-leasing activities. There is no authority for the cramped consultation here.

1. NMFS Violated Requirements for "Staged Consultation."

Staged ESA consultation is permissible to a degree for OCSLA lease sales. The problem is that NMFS's approach *here* violates the requirements for the staged consultation endorsed by the courts and codified in NMFS's regulations.

Begin with Defendants' reliance on *North Slope Borough v. Andrus*. *See* ECF 34, PageID.1421. In that case, like here, Interior had attempted to narrowly define the scope of the agency action to include only "the lease sale and pre-exploration activities." *N. Slope Borough v. Andrus*, 486 F. Supp. 332, 350 (D.D.C. 1980). Unlike here, NMFS rejected Interior's narrow categorization and instead produced a "biological opinion" that "attempted to perform, and in some respects did perform, a comprehensive analysis of all the ramifications of the lease sale," *id.* at 351, including effects of post-leasing activities such as oil spills from drilling, *id.* at 353. The District Court likewise rejected Interior's characterization because agency action is a "legal concept" that must be determined in reference to

the ESA. *Id.* at 350-51. The D.C. Circuit agreed that the "legal definition" must control, so "a 'biological opinion' may not deal exclusively with any one particular stage of an outer continental shelf project." *N. Slope*, 642 F.2d at 608. This is because "[e]valuating an outer continental shelf project in the light of all contemplated and congruous actions merely reflects that 'pumping oil' and not 'leasing tracts' is the aim of congressional policy." *Id.* Therefore, the "agency action" for an OCSLA lease sale includes "the lease sale and all subsequent activities." *Id.* at 609. While the court found OCSLA's "checks and balances" relevant to the sufficiency of NMFS's depth of analysis of that entire agency action, it affirmed that "the segmented approach of OCSLA does not attenuate ESA's notion of 'agency action'" itself. *Id.* The court did not hold that consultation could exclude post-leasing activities, as Defendants argue, but rather that the biological opinion was sufficient because it *did* include "a comprehensive analysis of all the ramifications of the lease sale." *Id.* (citation omitted).

*Village of False Pass v. Clark* also involved a biological opinion that evaluated the effects of post-leasing activities. *See* 733 F.2d 605, 607 (9th Cir. 1984) (noting discussion of effects from exploratory drilling and seismic testing). The two questions before the Ninth Circuit were whether Interior violated the ESA by 1) issuing a final leasing notice before officially receiving the biological opinion and 2) failing to adopt immediately the biological opinion's recommended

restrictions on future exploration and drilling approvals. *Id.* at 609. Neither involved the biological opinion's scope, nor did the court hold that NMFS may ignore post-leasing activities. Rather, the court emphasized that "[n]either the regulations, nor OCSLA itself, dilute the full application of ESA to actions" under OCSLA. *Id.* at 612.

*Tribal Village of Akutan v. Hodel* similarly involved a biological opinion that evaluated post-leasing activities; the court held only that Interior was not required to adopt NMFS's suggestions fully. 869 F.2d 1185, 1193 (9th Cir. 1988). Interior's obligations to adopt a biological opinion's suggested mitigation have no bearing on NMFS's duty to evaluate the entire agency action.

*Conner* is not, as Defendants claim, "inapposite." ECF 34, PageID.1422. Rather, *Conner* expressly followed the key holding in *North Slope*—that for an OCSLA lease sale, "the 'agency action' encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production"—to hold that the same scope applies for a Mineral Leasing Act (MLA) lease sale. 848 F.2d at 1453. Defendants' claim that *Conner* is inapposite because it involved the MLA ignores *Conner*'s express holding that "agency action" has the same meaning under OCSLA and the MLA. ECF 34, PageID.1422-23. Defendants instead focus on a separate section of the opinion that discusses whether MLA sales may use 50 C.F.R. § 402.14(k)'s incremental-

step consultation process. *See id.* (citing *Conner*, 848 F.2d at 1455-58). The court concluded that incremental-step consultation may be used for leasing under OCSLA, but not the MLA. *Conner*, 848 F.2d at 1455-57.

NMFS promulgated the incremental-step consultation regulation specifically to codify the "consultation approach sanctioned by the court in *North Slope*." 51 Fed. Reg. 19926, 19955 (June 3, 1986). As with the staged consultation in *North Slope*, the regulation requires NMFS to "issue a biological opinion on the incremental step being considered, including its views on the entire action"; NMFS may not consult informally and may not truncate its initial analysis to exclude post-leasing activities. 50 C.F.R. § 402.14(k); *see also* Ex. 1: *ESA Handbook* 5-8. Defendants concede that NMFS did not comply with 50 C.F.R. § 402.14(k). ECF 34, PageID.1429-30. It necessarily follows that NMFS did not comply with the "consultation approach sanctioned by the court in *North Slope*." 51 Fed. Reg. at 19955.

That Interior did not "request" incremental-step consultation demonstrates only that the Marine Minerals Administration (MMA) chose (and NMFS adopted) a consultation approach that violates the ESA. *See* ECF 34, PageID.1429. "If the Federal agency chooses not to use the incremental step process, [NMFS] must render its biological opinion for the entire action." 51 Fed. Reg. at 19955. Likewise, that the agencies did not "undertake formal consultation" here when they

did in *North Slope* does not make that case inapplicable, as Defendants argue, ECF 34, PageID.1430, but undermines NMFS's claim that its consultation here is consistent with that case.[1]

In every OCLSA leasing case Defendants cite, the agencies completed formal consultation resulting in a biological opinion that evaluated the effects of post-leasing activities. NMFS promulgated a regulation to codify that approach that requires a biological opinion evaluating the effects of the entire action beyond the initial lease-sale step. Defendants offer no authority upholding an informal ESA consultation on an OCSLA lease sale, much less one limited to only preliminary activities. In short, NMFS's unprecedented, narrow approach to consultation on the Mariana Islands lease sale is contrary to Defendants' own caselaw and violates the ESA's requirement to evaluate "the effect of the *entire* agency action"—from the issuance of leases through post-leasing exploration, development, testing, and mining. *Conner*, 848 F.2d at 1453.

---

[1] That MMA may later "review and disapprove any post-leasing activities" does not make *Environmental Defense Center v. Bureau of Ocean Energy Management* irrelevant, as Defendants contend, ECF 34, PageID.1431, because that case states: "That the agencies might conduct ESA review on individual permits in the future does not affect our analysis," 36 F.4th 850, 890 (9th Cir. 2022). Nor is the quoted language dicta; it was a basis of the court's irreparable harm finding. *See id.*

### 2. NMFS Lacks Any Support for the Cramped Consultation Approach Taken Here.

Faced with established authority prohibiting NMFS's consultation approach, Defendants attempt to muster a theory to justify limiting the "agency action" to only preliminary activities. Their arguments rely on principles that courts have rejected and on inapposite cases.

First, Defendants advance the Humpty-Dumptian argument that the agency action must be limited to only issuance of leases and preliminary activities because that is how Interior described it. ECF 34, PageID.1418; *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 n.18 (1978) ("'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what *I* choose it to mean—neither more nor less.'" (quoting *Through the Looking Glass*, in *The Complete Works of Lewis Carroll* 196 (1939))). However, "an agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue." *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000). "Ultimately, the meaning of 'agency action' is determined as a matter of law by the Court, not by the agency." *Id.* (citing *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994)).[2] Courts find an agency's description

[2] NMFS's attempt to distinguish *Pacific Rivers* on the facts is misplaced because it is the case's statutory interpretation that is relevant here. *See* ECF 34 PageID.1423 n.3.

of its action arbitrary and capricious if it is inconsistent with "the entire agency action." *E.g.*, *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521-25 (9th Cir. 2010) ("We interpret the term 'agency action' broadly, because caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." (citation omitted)). Agencies may not evade the well-established principle that the entire agency action at the lease sale stage includes post-leasing activities by simply not mentioning them. Permitting an action agency to narrowly define its action in that way would result in "impermissible segmentation [that] would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003).

Second, Defendants emphasize that post-leasing activities require additional approvals that Interior might deny. ECF 34, PageID.1418-21; *see id.*, PageID.1420 n.2 (acknowledging Interior retains the same authority to deny later approvals for both oil-and-gas and minerals). But the *North Slope* court acknowledged that regulatory structure when it held that post-leasing activities nonetheless are part of the entire agency action at the lease sale stage; even though offshore drilling in the Beaufort Sea had never previously been authorized. *See* 642 F.2d at 593-94, 609. Indeed, the incremental-step consultation process was developed precisely to

provide the framework for reconciling ESA compliance at different approval stages.

Third, Defendants attack a strawman by claiming NMFS was not required to assume "Interior will approve future post-leasing activity." ECF 34, PageID.1419. The issue is not whether NMFS needs to make categorical assumptions, but how NMFS must handle uncertainty about post-leasing activities. "[I]ncomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available." *Conner*, 848 F.2d at 1454 (citing 16 U.S.C. § 1536(a)(2)). NMFS "cannot ignore available biological information or fail to develop projections of [post-leasing] activities which may indicate potential conflicts between development and the preservation of protected species." *Id.* Doing that analysis before leasing could, for example, identify areas that should be excluded from leasing or "identif[y] potential conflicts between the protected species and post-leasing activities due to the cumulative impact of" those activities. *Id.*

The ESA commands NMFS to evaluate "the best scientific and commercial data available" on post-leasing activities, even if uncertainties exist. 16 U.S.C. § 1536(a)(2). The discussion from *North Slope* on which Defendants rely simply reflects the principle that, "where the information is not readily available, [courts] cannot insist on perfection." *San Luis & Delta-Mendota Water Auth. v. Jewell*,

747 F.3d 581, 602 (9th Cir. 2014); *see* ECF 34, PageID.1421. While the agencies can more fully evaluate environmental effects at later stages "as information and experience is collected," they still must conduct "a comprehensive analysis" of the scientific and commercial information that *is* available on the entire action at the lease sale stage. *N. Slop*e, 642 F.2d at 609 (citation omitted).

The one thing NMFS could not do is categorically exclude post-leasing activities. In doing so, NMFS effectively assumed that Interior will not approve *any* post-leasing activities. The record is bereft of any analysis supporting that assumption. Instead, the record reflects that NMFS understood the action to be for "commercial mining." Ex. 3: LOC at C00213. The Court can also take judicial notice that MMA is offering the sale to implement an executive order to "Unleash[] America's Offshore Critical Minerals." Ex. 7: 90 Fed. Reg. 17735 (Apr. 29, 2025); *see also* Ex. 2: Biological Assessment (BA) at C00020 (stating need for sale "is to help meet U.S. demand for critical minerals"). And the companies spending millions of dollars to acquire leases presumably intend to mine them. *See* Ex. 10: Proposed Leasing Notice at 6 (minimum $3 million bid for each lease area); *see also* BA at C00178 (providing that several companies expressed interest in leases). If leasing truly were unlikely to lead to mineral extraction, the lease sale would not meet Interior's stated "purpose and need," and proceeding with the sale would "not be considered reasonable or appropriate."

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005).

Finally, Defendants rely on several inapposite cases discussing ESA obligations at the *programmatic* stage, which does not exist for leasing minerals other than oil and gas. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior* (*CBD*), 563 F.3d 466, 473 (D.C. Cir. 2009) (discussing OCLSA's four-stage process for oil and gas development). Defendants cite *CBD* and *Healthy Gulf v. U.S. Department of the Interior*, 152 F.4th 180 (D.C. Cir. 2025), to suggest that ESA requirements are weakened at the lease sale stage—the second stage. ECF 34, PageID.1422. But those cases involved challenges at the leasing *program* stage—the first stage, which does not exist here—where proposed lease sales "might never come to pass." *CBD*, 563 F.3d at 483; *see also Healthy Gulf*, 152 F.4th at 198. In finding an ESA claim unripe at that stage, the *CBD* court explained that ESA consultation *is* required at each of the subsequent stages (including at the lease sale stage). 563 F.3d at 483. Because this case involves a lease sale, not a leasing program, Defendants' cases do not relieve NMFS of its obligation to evaluate "the entire leasing project." *Conner*, 848 F.2d at 1453.

Defendants also cite *Save Long Beach Island v. U.S. Department of the Interior*, but that court was addressing an offshore wind planning phase akin to "the first stage of a leasing program," which did "not commit the agency to any

decisions about leasing." 663 F. Supp. 3d 1, 10 (D.D.C. 2023).[3] Likewise, *Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Management* involved management plan amendments that were comparable to "the preliminary stage of a leasing program" discussed in *CBD* and that did "not authorize the issuance of any specific leases," No. 1:13-cv-01988-JLK, 2018 U.S. Dist. LEXIS 163703, at *19-20 (D. Colo. Sept. 11, 2018), so "leasing [was] not a direct effect of the action," *id.* at *27. Unlike in those programmatic cases, NMFS *is* consulting on a lease sale here. *Conner*'s statement of consultation obligations for an OCSLA lease sale controls.

B. Even If Post-Leasing Activities Were Not Part of the Agency Action, NMFS Would Still Be Obligated to Evaluate Their Effects.

Even if post-leasing activities were not part of the agency action, NMFS would still be obligated to consider their impacts because they meet the definitions of "indirect effects" of the action and effects of "other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018).

Defendants claim post-leasing activities are not indirect effects because they are not "reasonably certain to occur." ECF 34, PageID.1424-27 (quoting 50 C.F.R. § 402.02 (2018)). The Ninth Circuit has stated indirect effects encompass effects

[3] The unpublished *Fisheries Survival Fund v. Haaland* opinion that Defendants cite is inapposite because it involved the ripeness of a National Environmental Policy Act claim, not the ESA's statutory requirements. 858 F. App'x 371, 372 (D.C. Cir. 2021).

"that the action makes possible (or indeed, more probable)." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014). Defendants do not and cannot dispute that a lease sale makes exploration, development, testing, and mining both possible and more probable. Instead, Defendants ask the Court to disregard the Ninth Circuit's standard, without citing any supporting authority. ECF 34, PageID.1424-25 n.4.

The *ESA Handbook* belies Defendants' argument that post-leasing activities are not reasonably certain. While Defendants focus on one of the *Handbook*'s bases for finding an effect reasonably certain, *id.*, PageID.1425 (quoting *ESA Handbook* at 4-29), another basis is if effects "are a logical extension of the proposed action," *ESA Handbook* at 4-29. Because the lease sale's justification is "for the purpose of commercial mining," LOC at C00213; *see also* 90 Fed. Reg. 50872, 50873 (Nov. 12, 2025) (stating lease sale's purpose is "to accelerate the responsible development of OCS mineral resources . . . and ensure secure supply chains"), such mining is a logical extension of the lease sale. *Contra Rocky Mountain Wild*, 2018 U.S. Dist. LEXIS 163703, at *29 (finding "issuing additional leases is not a logical extension of the 2013 Amendments").

Finally, Defendants ask the Court to disregard the government's stated objectives and expectations that leasing will result in commercial mineral production, and instead speculate that the government will abandon its chosen

course of action. *But see* 90 Fed. Reg. at 17735 ("It is the policy of the United States to … creat[e] a robust domestic supply chain for critical minerals derived from seabed resources … ."). Defendants' argument that "a primary purpose" of leasing is to develop information to inform future assessment "of mining in a particular location" does not mean it is the *only* purpose. ECF 34, PageID.1426. Both MMA and NMFS have expressly stated that *another* purpose is commercial mining to meet mineral demand. LOC at C00213; *see* BA at C00020; *see also* 43 U.S.C. § 1331(c) (stating a "lease" as used in 43 U.S.C. § 1337(k) "authorizes exploration for, and development and production of, minerals"). Fundamentally, Defendants' argument is that the agencies and the Court must assume the lease sale will not achieve its intended purpose. Nothing in the record supports that claim.

Even if not indirect effects, post-leasing activities meet the definition of "interrelated or interdependent" actions. *See* ECF 27-1, PageID.1156. Defendants claim the Ninth Circuit requires that interrelated or interdependent actions "must themselves be likely to occur before NMFS must evaluate them." ECF 34, PageID.1428 (citing *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 988 (9th Cir. 2023)). But that principle appears nowhere in the cited opinion, which instead evaluated the standard for "indirect effects, which explicitly incorporate the reasonably certain standard." *Haaland*, 87 F.4th at 988. Likewise, the cited 1986 Federal Register entry states the "reasonably certain to occur" standard applies to

*indirect effects*, while "the 'but for' test should be used to assess whether an activity is interrelated with or interdependent to the proposed action." 51 Fed. Reg. at 19932. Applying the "but for" test here is simple: but for the lease sale, post-leasing activities could not occur. *Contra* ECF 34, PageID.1429 n.5 (confusing but-for causation with sufficient causation). Post-leasing activities qualify as interrelated or interdependent actions, if not also as indirect effects.

C. NMFS's Evaluation of Effects from Preliminary Activities Is Arbitrary and Contrary to the ESA.

Separate from the scope of agency action, NMFS's conclusion regarding preliminary activities is arbitrary and contrary to the ESA. First, given evidence in the record, NMFS's conclusion that marine debris is not likely to adversely affect species is arbitrary. Second, NMFS unlawfully relied on MMA's nonbinding promises to conclude that acoustic surveys are not likely to adversely affect species.

1. Marine Debris

NMFS recently concluded that trash and debris from oil and gas operations in the Gulf are "likely to adversely affect" whales and sea turtles, even though the amount of trash and debris "is expected to be minimal." Ex. 5: Gulf Biological Opinion at C00730-38. NMFS reached the opposite conclusion here. The Gulf biological opinion is in the administrative record, but Defendants admit NMFS did

not consider its findings on issues other than acoustics. ECF 34, PageID.1438 n.7.[4] The Gulf biological opinion is not a "marginally related administrative action," as Defendants contend, ECF 34, PageID.1437 (quoting *Zinke*, 856 F.3d at 1263), but rather involves many of the same species (sperm whales and loggerhead, green, and leatherback sea turtles) facing the same threat (trash and marine debris released from vessels conducting activities on OCSLA leases) as here, *see* ECF 27-1, PageID.1176-77. NMFS's admitted failure to consider or address the Gulf biological opinion's contradictory findings renders arbitrary NMFS's concurrence here that those stressors are "not likely to adversely affect" whales or sea turtles. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) ("NMFS's factual findings in the earlier environmental assessments appear to be 'relevant data,' such that it was incumbent on the agency to offer a 'satisfactory explanation' for its decision in light of the earlier findings.").

Defendants cannot rectify that gap by offering *post hoc* reasons why NMFS's disparate conclusions might be harmonized. The ESA requires NMFS to evaluate effects *before* issuing a letter of concurrence, not "in defendants' briefs"

---

[4] It is irrelevant whether the biological opinion still has "legal effect," *id.*, PageID.1437 n.6, because whether *de minimus* debris is likely to have an adverse effect is a factual, not a legal, issue, *see Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (stating agency needs to explain change in views where it makes "factual or scientific findings").

after being sued. *Id.* at 1049. Indeed, "Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself." *Id.* at 1050.

Moreover, Defendants' *post hoc* rationalizations do not make sense. For example, Defendants argue the topography is "vastly different" because activities near the Mariana Islands will occur "at depths up to 7,650 meters," while activities in the Gulf occur "at depths of as little as 3,346 meters." ECF 34, PageID.1437-38. 3,346 meters falls within the "up to 7,650 meter" range. They are not different. And Plaintiffs do not contend, as Defendants imagine, that the magnitude of effect is the same for seabed mining activities as Gulf oil and gas activities. *Contra* ECF 34, PageID.1438. Rather, the issue is that NMFS concluded exposure to a "minimal" amount of debris is likely to adversely affect species in one consultation but is not likely to adversely affect the same species in this consultation. *See ESA Handbook* at xv ("If incidental take is anticipated to occur as a result of the proposed action, an 'is likely to adversely affect' determination should be made."). The record's absence of a "satisfactory explanation" for the contradiction renders NMFS's conclusion arbitrary. *See Locke*, 626 F.3d at 1051.

2. Non-Binding Mitigation of Acoustic Harms

NMFS concluded that acoustic surveys will not adversely affect species based on unenforceable, non-specific promises from MMA that it would require mitigation. *See* ECF 27-1, PageID.1177-78. Defendants concede that NMFS may rely on mitigation only if it is "backed by some form of enforceable obligation." ECF 34, PageID.1440 (citing *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743, 747 (9th Cir. 2020)). But Defendants fail to identify any specific, enforceable obligation that backs up MMA's promise.

Defendants quote the biological assessment's statement that MMA "will not approve [a preliminary] activity" if it does not comply with *de minimis* criteria. *Id.*, PageID.1439-40 (quoting BA at C00094-95). This statement ignores that 30 C.F.R. § 582.21(d) expressly authorizes lessees to proceed with preliminary activities without MMA's approval. Defendants cite no enforceable obligation for MMA to block such planned activities. Further, the regulatory definition that preliminary activities are "those which have no significant adverse impact on the natural resources of the OCS," *id.*, is vague, so is not a "specific" obligation to implement detailed acoustic criteria, s*ee Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 935-36 & n.17 (9th Cir. 2008). Ultimately, the regulations permit a lessee to submit to MMA a plan for preliminary activities that exceed the *de minimis* criteria and to proceed with those activities 30 days later without any review or action by

MMA. Defendants cite no enforceable authority mandating a different result. Finally, the lease stipulations also allow lessees to conduct "other activities not included in the [environmental assessment]" if they give notice to MMA. Ex. 9: Proposed Lease Stipulation No. 1. Even if MMA reviewed the submissions, the ESA does not permit the action agency to self-consult on whether these "other activities"—which the consultation did not evaluate—would have a *de minimus* impact. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13(c), 402.14(b)(1) (requiring NMFS's "written concurrence").

NMFS's reliance on hypothetical, nonbinding acoustic criteria for its concurrence determination violates the ESA. *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

III. THE COURT SHOULD VACATE THE LETTER OF CONCURRENCE.

While Defendants equivocate about the remedy standards, the Ninth Circuit has been clear: "vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (citation omitted). Whether to exercise that discretion "depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (citation omitted). Defendants' assertion that NMFS's errors "likely require only updated

descriptions and explanations," ECF 34, PageID.1442, ignores the biggest problem with its consultation: the ESA prohibits NMFS's constrained scope of consultation entirely. "There is no 'serious possibility that [NMFS] will be able to substantiate [that] decision.'" *Mont. Wildlife*, 127 F.4th at 50 (citation omitted). Defendants oddly claim that leaving the Letter of Concurrence in place would "preserve environmental protections," ECF 34, PageID.1442, when doing so would allow leasing to proceed, causing environmental harms that vacatur would avoid. Defendants' unsupported assertion that leaving the Letter in place would avoid some unidentified "regulatory disruption" also fails to meet their burden to deviate from the default vacatur remedy. *Id.* There would be far more regulatory disruption if leases were issued next month in reliance on an unlawful consultation, only to be revoked or amended if NMFS identifies adverse effects on remand.

## IV. CONCLUSION

Established law bars NMFS's unprecedented, cramped approach to consultation here, which no court has ever sanctioned. The Court should reject NMFS's gambit to avoid looking at effects from the entire agency action.

DATED: November 5, 2026.

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE

850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Our Common Wealth 670, PåganWatch,
Conservation Council for Hawai‘i, and
Center for Biological Diversity